We will hear argument this morning in Case 23-5572, Fischer v. United States. Mr. Green. Mr. Chief Justice, and may it please the Court, Congress enacted 1512C in 2002 in the wake of the large-scale destruction of Enron's financial documents. The statute, therefore, prohibits the impairment of the integrity or availability of information and evidence to be used in a proceeding. In 2002, Congress hedged a little bit and added Section C-2 to cover other forms of impairment, the known unknowns, so to speak. It was, after all, the dawn of the information age. Until the January 6th prosecutions, Section 1512C-2, the otherwise provision, had never been used to prosecute anything other than evidence tampering. And that was for good reason. This Court has said that otherwise, when used in a criminal statute, means to do similar conduct in a different way. The government would have you ignore all that, or disregard all that, and instead convert C-2 from a catch-all provision into a dragnet. One of the things that that dragnet would cover is Section C-1. Our construction of this statute at least leaves C-1 and C-2 to do some independent work. The January 6th prosecutions demonstrate that there are a host of felony and misdemeanor crimes that cover the alleged conduct. A Sarbanes-Oxley-based, Enron-driven evidence tampering statute is not one of them. I welcome the Court's questions. Mr. Green, how do we determine what these two provisions have in common? Do we look after the otherwise or before, and why? You look at before, Justice Thomas. And you look at the kinds of manner in which documents and records are to be impaired. And then you look after to see what the effect is. But I would submit that the effect is the same. In order to cause the impairment of the integrity of the evidence that's to be used in a proceeding, or to prevent its availability. So we look back, and we look forward. Wouldn't it be just as easy to look at the C-2 and then ask what it has in common with C-1 and use C-2's provisions as a basis for that similarity? No, because C-2 speaks to the effect of the actions that the otherwise clause covers. So, in other words, we look at C-1 and we see that Congress is concerned about documents and records and other objects and things that are done to those to impair the integrity of those. And the effect of that is to obstruct. And so C-2 omits that object and verb section. But you could just as easily say that Congress is really concerned about things that obstruct, influence, or impede official proceedings. And that's C-2. So why isn't that the basis for the similarity? Well, because of the presence of the otherwise provision. So otherwise, as I mentioned, otherwise, this Court has said, means to do similar conduct in a different way. So what we've got here is impairment of evidence being done in a different way. I'm sorry. I thought it was, yes, doing it in a different way. So let me give you an example. There is a sign on the theater. You will be kicked out of the theater if you photograph or record the actors or otherwise disrupt the performance. If you start yelling, I think no one would question that you can be expected to be kicked out under this policy, even though yelling has nothing to do with photograph or recording. The object that the verb is looking at, the verbs are looking at, is the obstruction. It's not the manner in which you obstruct. It's the fact that you've obstructed. Isn't that the structure of this provision? It is, Your Honor. It's in part the structure of the provision. But what your hypothetical omits is that there is a specific retriculation, I guess it's called, of all of the different sorts of things that might be done to evidence to begin with. Except that what's fascinating about one, which is not about two, is that one doesn't require you to have actually impeded the proceeding. One requires you to have that intent, but you don't actually have to accomplish the intent.  And so that's a very different articulation of what the object of two is. The object of two is the actual disruption of the proceeding. I respectfully disagree because... Well, why? Look at the language. Alters, destroys, mutilates, or conceals a record. I do that in my home. And I do it anticipating that it might be needed. All I have to do is have the intent to impair. By that very language, I don't have to have an actual proceeding that I've impaired. On two, you need an actual proceeding to impair. I guess I'm a little confused, Justice Sotomayor, because as I read this, I would think that the government would say that any attempt at one is also covered by the statute, and I'm not sure that I would disagree. So I don't think that there has to be an actual impairment. No, I do think under one, you don't need an actual impairment. Under two, you do. When you read it, the verb requires you to actually obstruct the proceeding in two. Nowhere in one do you actually have to obstruct. Well, in two, you only have to attempt to do the things that are in two. No, otherwise obstructs or impedes. Or attempts to, yes. Yes. Counsel, can I ask you whether, let's imagine that we agree with you. On remand, do you agree that the government could take a shot at proving that your client actually did try to interfere with or under C1, or actually, no, sorry, under C2, obstruct evidence because he was trying to obstruct the arrival of the certificates arriving to the Vice President's desk for counting? So there would be an evidence impairment theory? I'm quite sure that my friend would take a shot, Your Honor, but I would say no. And the reason why is that this statute prohibits operation on specific evidence in some way, shape, or form. Attempting to stop a vote count or something like that is a very different act than actually changing a document or altering a document or creating a fake new document. Well, he's obstructing evidence in my hypothetical. I mean, he's not actually altering the vote certificates, which is why I corrected myself and said under C2. I mean, would that be different than someone, say, in a trial or criminal proceeding, trying to prevent evidence that was going to be introduced in the proceeding from making it there? So I'm imagining him acting on the certificates, not the act of counting them. Well, again, I think they could try it, but I don't think that we're talking about trying to impair just anything other than the evidence itself. We're trying to obstruct a proceeding. And there's questions about what proceeding means here, as Your Honor doubtless knows. But what the government would essentially be doing, as you noted, is converting what they've charged in C2 to a C1 type of crime. No, no, no, no, C2. I mean, maybe I'm misunderstanding your argument, but I thought your argument was that C2 picks up other things, but they just have to be evidence-related. So in the hypothetical I'm giving you, it's evidence-related because it's focused on the certificates, but it's obstruct or impede, say, the certificates arriving to the vice president's desk, insofar as the goal is to shut down the proceeding and therefore interfere with the evidence reaching the vice president. That's closer. It's definitely closer. But if you zoom out and look at all of 1512 in order to understand what kinds of impairment we're talking about, we are talking about or Congress is prohibiting the kinds of impairments that actually change documents that actually affect their integrity. If it's just impeding or delaying, we'd submit actually that that is not part of 1512C. Delays are mentioned in five other parts of 1512, but not in C. Mr. Green, if Justice Barrett is wrong, then what work is C2 doing? I mean, it seems like you've just now rearticulated only the theory of C1, and you're saying that you have to make it into C1 in order to have this statute apply. So can you help me at least understand, under your theory, what additional thing does C2 offer? Let's look at the verbs of C1, which are alter, destroy, mutilate, and conceal, and let's think about their antonyms. So one, instead of destroy, would be actually to create. So one could use some sophisticated computer program. We've heard an awful lot about AI, and we've heard about the possibility of deepfake photographs. So I think you would violate C2 if you created a photograph that established your alibi in some extremely sophisticated way that would get it admitted into evidence or you submit it for evidence would probably be where the crime occurred. So you're saying there are other things other than particularly altering, destroying, mutilating, or concealing, but it has to be limited to a record? Not necessarily because, I mean, one other example, if I might, Your Honor, would be not to conceal but to disclose. So if I disclosed a witness list in a large multi-defendant drug trial, my purpose in doing that, though I haven't altered the document, would be to intimidate the witnesses or prevent their attendance. That, on our submission, would also violate C2. All right, can I just ask you one other question just so that I can fully understand your theory? You keep using the term evidence, and that does not appear in the statute. The statute C1 says record, document, or other object. Now, I appreciate that evidence can be such a thing, but you can imagine a world in which those two are different. So where does evidence come in in your theory, and why is it there? Well, the title of the statute refers to tampering with witnesses, victims, and informants. But along with witnesses, victims, and informants comes evidence that they provide, whether in the form of testimony or whether in the form of documents. No, I understand, but the statute, the provision we're talking about here, does not use the term evidence. And so, and instead, or in addition, it uses the term official proceeding, which is elsewhere defined not in terms of, you know, court proceedings or investigations. It's just a proceeding, you know, before Congress. So is it your argument that the only thing that this provision covers is something that is tantamount to evidence in an investigation or trial? It is, Your Honor, and we're not limiting it. Our position does not limit it to documents or records. I would submit C1, which we say carries into C2 through the otherwise clause, when it says other object, is pretty broad. And it need not be as 1512F provides. It need not be admissible to you. F, yeah, F. It need not be admissible. So it could cover things like electronic records. It could cover communications. It could cover e-mails. It could cover all kinds of things that we think get used by fact finders in a formally convened hearing. Let me take you back to just a quick question. What about the Second Circuit's decision in U.S. v. Reich where what was involved was not evidence? It was a forged court order. Would that fall within C2? Yes, we think that does fall within C2. And I think anything that is falsified in this operative way that is used to obstruct a proceeding would be covered by C2, yes. And just to take you back to the question that Justice Thomas started you with, it seems to me there are two choices here, and you could read this as otherwise obstructs a proceeding or otherwise spoils evidence. And you are using it to say otherwise spoils evidence with, you know, But it doesn't say that. It says otherwise obstructs a proceeding. There are plenty of ways to write the statute that you want to write. You could just say otherwise affects the integrity or availability of evidence in an official proceeding. You could combine official proceeding with evidence in other ways, you know, one with you could replicate the mens rea that C1 has. I mean, there are ways in which C2, multiple ways, there are ways in which the drafters of C2 could have made it clear that they intended C2 to also operate only in the sphere of evidence spoilation. But it doesn't do that. All it says is otherwise obstructs, influences, or impedes. Certainly the statute could be written more precisely. Any statute could be written more precisely. It's not a question of precisely. The question is what is this otherwise? This is what Justice Thomas said at the beginning. What is this otherwise taking from C1? Of course there's commonality that's involved in an otherwise. There's both commonality and difference. But what is the commonality that C2 is drawing from C1? It tells you what the commonality is. The commonality is that the things that fall into C2 also have to obstruct, influence, or impede. But what C2 does not say, really does not say, is everything in C2 also has to spoil evidence. But this court has said that otherwise in a criminal statute means similar conduct. Similar conduct, obstruction of a proceeding. Different ways of carrying out that similar conduct, which is obstruction of a proceeding. The statute tells you what the similar conduct is right on its face. Respectfully, Justice Kagan, the statute tells you what the effect is. The conduct that's specified in C1 is altering, destroying, mutilating, or concealing a document, record, or other object. And so a drafter of the statute could easily omit something like that and would omit something like that for the sake of economy and also to hedge. Because we know that what comes before might not be exactly the same as after. So we're not going to repeat what we said there, but we're going to use a connector like otherwise to demonstrate that we're talking about similar conduct. And I would submit, Your Honor, that if you look at C2 alone, that is... Please. What's your best case for this, like, going backward and trying to find language that does not appear in the otherwise provision and trying to incorporate it into the otherwise provision? Well, I think Begay is our best case for sure. And that's not a very good advertisement, I would think. I mean, what Begay does is exactly that. So you have a very good case there. And it was a complete failure. You know, Begay said, we look back at this thing that Congress did not use in the otherwise provision, and we derived various things from it, and we put it in. It was purposeful, violent, and aggressive. And then a few years later, we said, where did that come from? We made it up, and we get rid of the whole thing. So that's not a great advertisement for rewriting a statute to take an otherwise provision that says what it says and turn it into an otherwise provision that says something else. We would submit that Begay was abrogated on other grounds, Your Honor. And the other grounds are the members of the court could not decide between an assessment of the types of things that came before otherwise versus the level of risk. And when that began to play out in complicated cases like Chambers and many others involving escape from a halfway house, it became, the court said, an untenable proposition to figure out what a potential harm to another person might be looking at what came before. That doesn't... I'm sorry, Mr. Green, go ahead and finish your sentence. Yeah, but that doesn't mean that the court's holding about how to construe a statute and its significant holding about otherwise was abrogated in and of itself as a result of the cases that came after Begay. Well, I'm not a fan of Begay. Some of us perceived at that time that there were problems, different problems with what the court did there. But I think there's a point in the colloquy that you've been having. The specific types of conduct that are enumerated in one, alter, destroy, mutilate, conceal, or record, document, et cetera, et cetera, have two things in common. One, they all involve documents or objects, and they also all involve the impairment of the object's integrity or availability for use in an official proceeding. So the similarity could be either of those things. And so I think that you may be biting off more than you can chew by suggesting, if you are indeed suggesting that the otherwise clause can only be read the way you read it. One might say it can certainly be read the way the government reads it, and that might even be the more straightforward reading. But it is also possible to read a clause like this more narrowly, and Judge Katz has provided an example of that in his opinion. If you have a statute that says anyone who kills or injures or assaults someone or otherwise causes serious injury, commits a crime, you wouldn't think that that applies to defamation. So it could be read your way. So then I think you have to go on to some other arguments and explain why your reading is better than the government's reading. Certainly, and I would submit, Your Honor, that there are plenty of other reasons why our reading is the better reason. And I'm not going to contest or bite off more than I can chew and say that the government's reading of C-2 is implausible. We think it's unsound, but it's unsound for the additional reasons that if one zooms out and looks at what the prohibited conduct is in 1512 generally, we are talking about interference or operation on forms of evidence and testimony that obstruct a proceeding. That's what 12 is all about generally. And I would submit, Your Honor, too, that as the briefing indicates, eus gem generis and nos et terra socius, those two venerated Latin canons also operate in our favor here, as well as the broader context of Chapter 73 and Section 15. All of these things are about doing things that obstruct a proceeding. 1512 and 1512C zero in on witnesses and evidence. Well, you have other arguments. You have surplusage arguments. You have arguments about the breadth of the government's reading of the provision. Do you want to say anything about those? Right. So with respect to surplusage, Your Honor, I would refer to Judge Katz's opinion, as you did in particular in the joint appendix at page 88, which lists out all of the different provisions in Section 1512. Fifteen of the 21 would be subsumed by the government's reading of C-2. The government's reading of C-2, I remind the Court, is so broad that it would cover anyone who does something, understanding that what they're doing is wrong in some way, that in any way influences, impedes, or obstructs an official proceeding of any type. Maybe limited by federal. There's a good case of this provision. Everybody knew it was going to be superfluous because it was a provision that was meant to function as a backstop. It was a later enacted provision. Congress had all these statutes all over the place. It had just gone through Enron. What Enron convinced them of was that there were gaps in these statutes, and they tried to fill the gaps. They tried to fill the particular gap that they found out about in Enron, and then they said, you know, this is a lesson to us. There are probably other gaps in this statute. But they didn't know exactly what those gaps were. So they said, let's have a backstop provision, and this is their backstop provision. Of course, in that circumstance, superfluity is very often a good argument when it comes to statutory interpretation, but it's not a good argument when Congress is specifically devising a backstop provision to fill gaps that might exist. They don't exactly know how they exist, but they think that they probably do exist in a preexisting statutory scheme, and that's what this provision is intended to do. Respectfully, Your Honor, a close reading of Yates, both the majority opinion and the dissenting opinion, demonstrates that this Court thought that 1519 was the backstop. That was supposed to be the omnibus provision, and the Court was fighting over what the meaning of tangible object was in 1519, but that was meant to plug the hole that Congress had. Counsel, I have such a hard time with the superfluidity argument because this entire obstruction section is superfluidity. There isn't one provision you can point to. You just said it. You can point to 1512, and you have 1519, which says destruction of evidence. How are they different? They're really not. You can point to any series, any provision, and point to superfluidity in this section, 1512 and otherwise. So we go back to Justice Kagan's position, which is what you don't have is a freestanding, otherwise obstructs influence or impedes any official proceeding. I don't see why that's not the backstop that Congress would have intended, and it's the language you've used. Well, it's an awfully odd place to put it, isn't it? I mean, in a subsection of a subsection in the middle back of the statute, to include a provision, it certainly takes over the 21 other provisions. The one thing that Justice Kagan pointed to which is clear, they wanted to cover every base, and they didn't do it in a logical way, but they managed to cover every base. Well, I think you can reconcile. I mean, again, that's what the court said about 1519 in Yates, and I don't understand how it is that the government can come before you today and say we need yet another catch-all, yet another omnibus crime. It will sweep in all kinds of other. We didn't get what we wanted in Section 15, so now we'll go to 1512C2 and see if we can expand that in this way to cover something that it has never covered before. Thank you, Counsel. Justice Thomas? Justice Alito? Justice Sotomayor? We've never had a situation before where there's been a situation like this with people attempting to stop a proceeding violently. So I'm not sure what a lack of history proves. I'm not sure that that's true. I point to the Hatfield Courthouse problems in Portland, Oregon. But let's also look at what the court has said in so many different cases, in Dubin, in Bond, in Yates, in Kelly. But there there was a difference in the use of words. Here, otherwise obstructs, influences, and repeats. You might have a problem with breadth, and the government could address that. But it's not unclear what those words mean. But the government has no way to address its problem with breadth. Well, we can let them answer it. Okay. Justice Kagan? Justice Kavanaugh? If it were just the language in C2 and so said, whoever corruptly obstructs, influences, or impedes, C2 without the word otherwise, that were the whole provision, do you acknowledge that the language would then be applied properly to a situation like this? Unfortunately, no. And the reason for that is that, again, applying all the other canons and applying the whole text canon and zooming out and looking at 1512, we would submit that C2 should still be read in the way we have suggested it be read as something that is an evidence impairment statute. I think also, as I mentioned, the Latin canons, the surplusage problem that C2 would create, all of those would still obtain if it sat there by itself without the otherwise. The otherwise is the icing on the cake. And finally, Justice Kavanaugh, I would mention that, as I mentioned to Justice Barrett, there's an issue. If you didn't have C1, just had C2 without the otherwise, I'm not sure I was clear on that. Oh, okay. Well, in that case, I think it gets even harder, but I would still say if we look at what 1512 is about, and if we look at this Court's cases on broad, plausible, but broad readings of criminal statutes, not being what the Court adopts when there's an available narrow reading, because Congress can fix that, we would still say that C2 doesn't perform the massive dragnet function that the government submits. Thank you. Justice Barrett? Yeah, I have a question about the phrase in C1, the specific intent. Do you agree it's specific intent with the intent to impair the object's integrity? Okay. What is your view about how that parenthetical applies to C2, if at all? Do you think that that intent requirement carries over? The corruptly intent requirement? Not corruptly. With the intent to impair the object's integrity or availability for use in an official proceeding. Yes, we do, Your Honor. So it carries over. And we say that's the object of the overarching mens rea. But how can that be? I mean, it seems like that C2 would read awfully oddly then. It would be otherwise obstructs, influences, or impedes any official proceeding with the intent to impair the object's integrity or availability for use in an official proceeding. That would be your position of how it would read? Well, I think that's right. I mean, it's awkward. I mean, there's no doubt that it's an awkward statute. But if you do the operation that I talked about earlier, which is we're just going to use otherwise to replace the verbs and the nouns in C1, then the statute makes perfect sense. With respect to intent, I think Your Honor makes an excellent point, which is that this intent is a specific form of intent. The corruptly, which has been construed to be the mens rea up there, is not different than, at least on this reading, or on the accepted reading by the D.C. Circuit right now, is not different than some form of specific intent. So corruptly is redundant? It seems like it's getting to be, yes. That's true. And our submission is that corruptly should mean something different. So should proceeding. That's how you marry 1512 with 1519. Justice Jackson. So I'm just still wondering if your theory about this provision might be too narrow, in a sense, because you've got evidence going and spoliation, in a sense. What I'm trying to work out in my mind is whether you would still have a decent argument if this 1512 language is read to prohibit the corrupt tampering with things that are used to conduct an official proceeding with the intent of undermining the integrity of the thing or access to the thing, and thereby obstructing the proceeding. It's not just evidence. It's an official proceeding. C-1 is an example of the corrupt tampering with certain things, and C-2 broadens it out a bit. It's not just documents and records. What do you think about that? I think that's a correct reading, Your Honor. I mean, as 1512-F demonstrates, it doesn't, you know, 1512-F we would submit actually supports our position because it says the evidence need not be admissible or free of a privilege claim. Now, what would that mean about what the statute is addressing if it's not evidence? But C-2 has been applied, and occasionally C-1 has been applied. In a non-evident true way. Yeah, to things that could become evidence, to the efforts to shape someone's grand jury testimony, to answers to interrogatories. Let me ask you about the question that Justice Barrett asked before. You know, you suggested that it has to be to the document, but, in other words, the activity has to be actually to the document, but I don't know why that's the case under C-2. Justice Alito says, well, one of the commonalities between C-1 and C-2 could be the impairment of the object's integrity or availability. Justice Barrett posits a scenario in which you have someone who is impairing the availability by doing something to prevent the object from getting to the proceeding. Why wouldn't that count under C-2? So this is, you know, preventing Congress from counting the electoral votes, for example. Let's say it's being done, she says it's in an envelope going to the vice president's desk and someone does something to impair or prevent that from happening. Why isn't that what C-2 could cover? Well, first it's not affecting the integrity of the document, Your Honor. Availability is also in the statute. But as I mentioned earlier, simply delaying the arrival of evidence at the courthouse. So not delay. Let's say the person steals the envelope and takes it away. Then it gets harder. I agree. They steal the envelope, they take it away, they rip up all of those things, which is certainly not what happened here, and it's not in the indictment. The ballots or the vote count is not even in the indictment. But we wouldn't have to decide that. We could send it back if we clarified that that is what the statute means. I'm trying to understand if you agree that that's what the statute could mean. No, I don't agree that that's what the statute means. Why not? The reason is that if you look at 1512, it is about a direct effect or, in some senses, an indirect effect, but in a limited way on evidence that's to be used in a proceeding. And proceeding, as I mentioned earlier. So as to limit its availability. So what I'm suggesting is in C2, if you're doing something to limit its availability, why doesn't it count? Because we're limiting the availability of its use by a fact finder in a proceeding. Again, that's the way to marry 1519, which covers all kinds of investigations and all kinds of other events, with 1512. 1512 is talking about evidence that's going to a formal convocation, some kind of hearing before the Congress or before any other body. Thank you. Thank you. Thank you, Counsel. Thank you. General Prelogar. Mr. Chief Justice, and may it please the Court, on January 6, 2021, a violent mob stormed the United States Capitol and disrupted the peaceful transition of power. Many crimes occurred that day, but in plain English, the fundamental wrong committed by many of the rioters, including Petitioner, was a deliberate attempt to stop the joint session of Congress from certifying the results of the election. That is, they obstructed Congress's work in that official proceeding. The government accordingly charged Petitioner with violating Section 1512C2, an obstruction offense that directly reads onto his conduct. The case as it comes to this Court presents a straightforward question of statutory interpretation. Did Petitioner obstruct, influence, or impede the joint session of Congress? The answer is equally straightforward. Yes, he obstructed that official proceeding. The terms of the statute unambiguously encompass his conduct. Petitioner doesn't really argue that his actions fall outside the plain meaning of what it is to obstruct. Instead, he asked this Court to impose an atextual limit on the actus reus.  The separate prohibition in Section 1512C2 should be limited to acts of evidence impairment. But that limit has no basis in the text or tools of construction. His reading hinges on the word otherwise, but that word means in a different manner, not in the same manner. And the two prohibitions in Section 1512C2 aren't unified items on a list where you could apply associated words canons. They're separate provisions. They have their own sets of verbs and their own nouns. They each independently prohibit attempts, which would be duplication that makes no sense on Petitioner's reading. And Congress included a distinct mental state requirement in C1 that it chose not to repeat in C2. Section 1512C2, by its terms, is not limited to evidence impairment. Instead, it's a classic catch-all. C1 covers specified acts that obstruct an official proceeding, and C2 covers all other acts that obstruct an official proceeding in a different manner. The court should say so and allow this case to proceed to trial. I welcome the court's questions. General, there have been many violent protests that have interfered with proceedings. Has the government applied this provision to other protests in the past, and has this been the government's position throughout the lifespan of the statute? It has certainly been the government's position since the enactment of 1512C2 that it covers the myriad forms of obstructing an official proceeding and that it's not limited to some kind of evidence impairment law. So have you enforced it in that manner? We have enforced it in a variety of prosecutions that don't focus on evidence tampering. Now, I can't give you an example of enforcing it in a situation where people have violently stormed a building in order to prevent an official proceeding, a specified one, from occurring with all of the elements like intent to obstruct, knowledge of the proceeding, having the corruptly mens rea, but that's just because I'm not aware of that circumstance ever happening prior to January 6th. But just to give you a flavor of some of the other circumstances where we have prosecuted under this provision, for example, there are situations where we've brought C2 charges because someone tipped off the subject of an investigation to the grand jury's hearings. There was another case where someone tipped off about the identity of an undercover law enforcement officer, and in those situations, there's no specific evidence, no concrete testimony or physical evidence that the conduct is interfering with. Instead, it's more general obstruction of the proceeding. Justice Alito mentioned the Wright case as well, and that's another one where it was a forged court order that prompted the litigant to dismiss a mandamus petition, but that didn't have anything to do with the evidence that was going to be considered in that proceeding. So what role does C1 play in your analysis? So we understand 1512C to split up the world of obstructive conduct of an official proceeding into the C1 offense and into C2. C1 covers everything it enumerates. It's the acts of altering, concealing, destroying records, documents, or other objects, and then C2 would only pick up conduct that obstructs an official proceeding in a different way. So there's no duplication or superfluity on our reading. Instead, Congress was taking this universe and dividing it up into two separate offenses. I think that's actually a virtue of our reading as compared to petitioners because I have not heard him articulate anything that would fall within C1 that wouldn't also come within C2. So on his reading, C2 really does just swallow C1 whole. Well, I mean, in the way you're reading it, C1 and C2 almost exist in isolation, certainly not affected by C1. We don't deny at all that there is a relationship between the two provisions, Justice Thomas. What is that relationship? And the relationship is the one Congress specified in the text. It's what follows the word otherwise. That is the relevant degree of similarity. What both C1 and C2 have in common is that they aim at conduct that obstructs an official proceeding. C1 does so in one way, tampering with records and documents. C2 does so with respect to all other conducts, but in a different manner does that. And I think that this has to be the road the court goes down to look at what Congress actually prescribed with respect to similarity because, in contrast, if you take up petitioner's invitation to come up with some atextual gloss from C1 to port over into C2, I don't understand what the court could look at to guide its determination of exactly what the relevant similarity would be. General, I'm sure you've had a chance to read our opinion released Friday and the voice in that case. It was unanimous. It was very short. But it explained how to apply the doctrine of Euston Generous. And what it said is that specific terms, a more general catch-all, if you will, term at the end, and it said that the general phrase is controlled and defined by reference to the terms that preceded. The otherwise phrase is more general, and the terms that preceded are alters, destroys, mutilates, or conceals a record and document. And applying the doctrine as was set forth in that opinion, the specific terms, alters, destroy, and mutilate, carry forward into two. And the terms record, document, or other object carry forward into two as well. And it seems to me that they, as I said, sort of control and define the more general term. So, Mr. Chief Justice, I think that the statute... Sorry, just to interrupt so I can put out exactly what... And the otherwise means in other ways. It alters, destroys, and mutilates record, document, or other objects that impede the investigation, and otherwise, in other ways, accomplishes the same result. So, I think the problem with that approach with respect to 1512 is that it doesn't look like the typical kind of statutory phrase that consists of a parallel list of nouns or a parallel list of verbs where the court has applied a eustem generis or the noscator canon. You know, these are separate prohibitions that have their own complex, nonparallel internal structure. And I think, actually, the best evidence that it's hard to figure out how you would define a degree of similarity between them just based on the word otherwise is that there are multiple competing interpretations at issue in this case. You know, Justice Alito touched on them, and they're reflected in the competing interpretations between Judge Katsas on the D.C. Circuit and Judge Nichols on the district court. Competing interpretations of what? And it relates to exactly the question you asked me, which is that Judge Nichols thought that C-1 should limit C-2, and he looked at it and said, well, the relevant thing about C-1 is it deals with records, documents, and other objects. And so that means C-2 should be limited only to other acts that impair physical evidence. Meanwhile, Judge Katsas looked at the specific intent requirement in C-1 to take action that impairs the availability or use of the evidence, and he defined a broader gloss to put on C-2 and said it's the other impairment of all other evidence. Well, they're just applying the same doctrine to different aspects of it, and I think you do that as well. What are the common elements? Alters destroy and mutilates a record or a document. You have the first few, what you're doing, and what you're doing it to, and you apply both of those, as it's said in Boisinet, controlling and defining the term that follows so that it should involve something that's capable of alteration, destruction, and mutilation with respect to a record or a document. That's how... So I actually don't even understand... When you apply that doctrine, again, as we did on Friday, it responds to some of the concerns that have been raised about how broad C-2 is. You can't just tack it on and say, look at it as if it's standing alone, because it's not. So let me respond to that in two ways. I do want to have a chance to address any concerns about breadth, but the more fundamental point, I think, is that I don't even understand Petitioner to be suggesting that you can mix and match the verbs and the nouns from C-1 and C-2 in this way. Judge Nichols had a more limited view that C-2 exclusively focuses on physical objects. It wouldn't apply to things like testimony because of the limitation that he gleaned from C-1. Judge Katsas, I think, maybe in line with your question, would interpret it more broadly. And the basic point of the textual matter is that there is nothing in the text of C-2 itself to disclose what the relevant similarity from C-1 ought to be. Instead, we think the relevant similarity is obstruction of an official proceeding because that's the language Congress chose. General, if that's the case, what work does Authorize do on your theory? Because I think I might, as I'm hearing you, think that whoever corruptly obstructs, influences, or impedes any official proceeding or attempts to do so stands alone. And otherwise, I'm not hearing what work it does. Can you explain to me what work it does on your view? Yes, so the work that Authorize does is to set up the relationship between C-1 and C-2 and make clear that C-2 does not cover the conduct that's encompassed by C-1. Now, I acknowledge that there will be... Beyond that, beyond that, beyond saying, okay, C-1 does some things, and the whole rest of the universe of obstructing, impeding, or influencing is conducted by C-2. Is that a fair summary of your view? Yes, but there was a good reason for Congress to do it this way. Oh, I understand. It's related to the statutory history. I understand that. And I would just say that... If I might. So what does that mean for the breadth of this statute? Would a sit-in that disrupts a trial or access to a federal courthouse qualify? Would a heckler in today's audience qualify or at the State of the Union address? Would pulling a fire alarm before a vote qualify for 20 years in federal prison? There are multiple elements of the statute that I think might not be satisfied by those hypotheticals, and it relates to the point I was going to make to the Chief Justice about the breadth of this statute. The kind of built-in limitations are the things that I think would potentially suggest that many of those things wouldn't be something the government could charge or prove as 1512 C-2 beyond a reasonable doubt would include the fact that the actus reus does require obstruction, which we understand to be a meaningful interference. So that means that if you have some minor disruption or delay or some minimal outburst, you don't think it falls within the actus reus. Does the actus reus first require the court to reconvene after the proceeding has been brought back into line? Or the pulling of the fire alarm, the vote has to be rescheduled? Or the protest outside of a courthouse makes it inaccessible for a period of time? Are those all federal felonies subject to 20 years in prison? So with some of them, it would be necessary to show nexus. So with respect to the protest outside the courthouse, we'd have to show that, yes, they were aiming at a proceeding. Yeah, they were trying to stop the proceeding. Yes, and then we'd also have to be able to prove that they acted corruptly, and this sets a stringent mens rea. It's not even just the mere intent to obstruct. We have to show that also, but we have to show that they had corrupt intent in acting in that way. We went around that tree yesterday. I know. I heard the argument yesterday. But I guess what I would say is that to the extent that your hypotheticals are pressing on the idea of a peaceful protest, even one that's quite disruptive, it's not clear to me that the government would be able to show that each of those protesters had corrupt intent. So mostly peaceful protests that actually obstructs and impedes an official proceeding for an indefinite period would not be covered? Not necessarily. We would just have to have the evidence of intent, and that's a high-value argument. They intend to do it, all right. Yes, if they intend to obstruct and were able to show that they knew that was wrongful conduct with consciousness of wrongdoing, then yes, that's a 1512c2 offense. What does corruptly add in your view? So corruptly adds the requirement that the defendant's conduct be wrongful and committed with consciousness of wrongdoing. And this traces to the court's decision in Arthur Anderson where the court said this is a term with deep historical roots, with a subtle meaning, and that it connotes not just knowledge of your actions, which is the intent to obstruct in this case, but further requires that it be done corruptly. And just to give you a more concrete example of how this has played out in the January 6th prosecutions, I'd point to the jury instruction in the Robertson case, which we refer to and quote in part on page 44 of our brief. There the jury was instructed that in order to show the defendant acted corruptly, the jury had to conclude that he had an unlawful purpose or used unlawful means or both and that he had consciousness of wrongdoing. So I think that that is an encapsulation of what the jury is asked to decide on top of the mere intent to obstruct. General, let me give you a specific example, which picks up but provides a little bit more detail with respect to one of the examples that Justice Gorsuch provided. So we've had a number of protests in the courtroom. Let's say that today while you're arguing or Mr. Green is arguing, five people get up one after the other and they shout either keep the January 6th insurrectionists in jail or free the January 6th patriots. And as a result of this, our police officers have to remove them forcibly from the courtroom. And let's say it delays the proceeding for five minutes. And I know that experienced advocates like you and Mr. Green are not going to be flustered by that, but in another case, an advocate might lose his or her train of thought and not provide the best argument. So would that be a violation of 1512C2? I think it would be difficult for the government to prove that. Why? At the outset, we don't think that 1512C2 picks up minimal, de minimis, minor interferences. We think that the term obstruct on its face connotes a meaningful interference with the proceeding. Well, it doesn't say, I'm sorry, C2 does not refer just to obstruct. It says obstructs, influences, or impedes. Impedes is something less than obstructs. I think that this is a verb phrase for iteration with obviously a foot. Well, okay, but the plain meaning, you're preaching the plain meaning interpretation of this provision. The plain meaning of impede in Webster's is to interfere with or get in the way of the progress of to hold up. In the OED, it is to retard in progress or action by putting obstacles in the way. So it doesn't require obstruction. It requires the causing of delay. So again, why wouldn't that fall within? You could say, well, we're not going to prosecute that. And indeed, for all the protests that have occurred in this court, the Justice Department has not charged any serious offenses. And I don't think any one of those protesters has been sentenced to even one day in prison. But why isn't that a violation of 512, a 1512 C2? We read the Actus Reis more narrowly. Now, perhaps you could look at some of the broader dictionary definitions and adopt a broader understanding of the Actus Reis. Still, there would be the backstop of needing to prove corrupt intent. I think that's a stringent mens rea. Well, that's not a corrupt intent. It's wrongful. Do you think it's not wrongful? I could imagine defendants in that scenario suggesting that they thought they had some protected free speech right to protest. They might say that they weren't conscious of the fact that they weren't allowed to make that kind of brief protest in the court. And I think it's in a fundamentally different posture than if they had stormed into this courtroom, overrun the Supreme Court police, required the justices and other participants to plea for their safety, and done so with clear evidence of intent to obstruct. Absolutely. What happened on January 6th was very, very serious. And I'm not equating this with that. But we need to find out what are the outer reaches of this statute under your interpretation. Let me give you another example. Yesterday, protesters blocked the Golden Gate Bridge in San Francisco and disrupted traffic in San Francisco. What if something similar to that happened all around the Capitol so that all the bridges from Virginia were blocked and members from Virginia who needed to appear at a hearing couldn't get there or were delayed in getting there? Would that be a violation of this provision? It sounds to me like that wouldn't satisfy the proceeding element nor the nexus requirement. Why would it not satisfy the proceeding? Let's say they want to get to the Capitol to vote. Well, if we have clear evidence that the purpose of the protesters who had set up the blockage somewhere some distance away from the court was because they had a specific proceeding in mind, maybe you have the proceeding, but still the court has required a nexus. And that's been the requirement in cases like Maranello, Aguilar, and Arthur Anderson where the court has said it does real narrowing work because you have to show that the natural and probable effect of the action is to obstruct. There has to be a relationship in time causation and logic. But, Justice Alito, the other thing I would say to this set of concerns is that there are other obstruction provisions, including in 1503, 1505, the Tax Obstruction Statute 7212 that use this exact same formulation that the court has characterized as an omnibus clause and never suggested could be subject to an evidence clause. So I don't think that to the extent you have concerns about those hypotheticals, your question about what would happen in this courtroom could be covered by 1503. And interpreting this exactly similarly isn't going to cure that issue. Let me give you one more example. An attorney is sanctioned under Rule 11 of the Federal Rules of Civil Procedure by filing pleadings, written motions, or other papers for the purpose of causing unnecessary delay or needlessly increasing the cost of litigation. And in a particular case, the judge imposes Article Rule 11 sanctions and says, this caused a lot of trouble. I can tell you it caused at least five work days for me, personally, all of this unnecessary paper. And it delayed the progress of this litigation. So I'm imposing Rule 11 sanctions. Why doesn't that fall within your interpretation of this provision? Congress created a specific safe harbor in 1515C. It's reprinted at page 17A to the appendix of our brief that specifies that advocacy or legal representation that is conducted as part of a proceeding shouldn't be understood as obstruction. So I think Congress is itself trying to draw some lines around participation in a proceeding on the one hand versus external forces that obstruct the proceeding on the other. So it falls within the language, doesn't it? What kind of evidence do you typically present in these January 6th cases to prove the corruptly element? So the January 6th prosecutions require us to show first that the defendants had knowledge that Congress was meeting in the joint session on that day. We have to show that the defendants specifically intended to disrupt the joint proceeding. And then with respect to using unlawful means with consciousness of wrongdoing, we have focused on things like the defendants' threats of violence, willingness to use violence here. We allege that petitioner assaulted a police officer. We have focused on things like preparation for violence, bringing tactical gear or paramilitary equipment to the Capitol. And I want to emphasize, Justice Kagan, that this is a stringent mens rea requirement that has very much constrained the U.S. Attorney's Office. We've charged over 1,350 defendants with crimes committed on January 6th, but we've only had the evidence of intent to bring charges against 350 for a 1512 violation. So how do you make that decision? How do you decide which defendants get charged under this statute as opposed to not? The dividing line has hinged usually on the evidence we have of intent. So we're looking for clear evidence that the defendant knew about the proceedings that were happening in the joint session in Congress that day, clear knowledge of the official proceeding. We've looked for evidence that the defendant specifically intended to prevent Congress from certifying the vote, and so used his actions to obstruct that proceeding. And then also, as I mentioned, the knowledge of wrongfulness or unlawful conduct can come about with respect to particular preparations that the defendants have made. And, you know, there are a number of cases where even though we thought we had the evidence beyond a reasonable doubt, there have been acquittals because there was testimony that was credited that the defendant thought the proceedings were over and wasn't intending to obstruct. Or one person thought and said he thought that law enforcement was waving him into the building. So even in situations where we think we have amassed the evidence, we still haven't always been able to sustain these convictions, and it's because of the stringent mens rea. General, can I ask you about your obstruction theory? Because you said that you see 1512c as dividing the world of an obstruction and that the nexus between 1 and 2 is the official proceeding and the obstruction of an official proceeding. I guess what I'm concerned about is how you then account for the rest of 1512, where official proceeding comes up over and over again and particular acts that one could view as obstructing the official proceeding, like killing or threatening or intimidating witnesses, is covered. So that if we read c. 2 to be obstructing an official proceeding, I don't understand what happens to the rest of those provisions. So to the extent you're pressing on the idea that there's surplusage, I don't think that that's true. There is certainly overlap or duplication. That's true on both of the readings in this case. I think in part it might even be more true on Petitioner's reading because he says that c. 2 is likewise focused on all of the evidence impairment ways to obstruct, interfering with testimony, interfering with documents and so forth, and so that very same duplication is going to be present on his reading. But with respect to superfluity, our interpretation doesn't create any technical superfluity, and that's because each of those other provisions that you cited, and in fact each of the other provisions of the obstruction laws, cover situations that 1512 c. 2 wouldn't cover. There are three principal distinctions. The first is that some of them have less than a corruptly mens rea. So for many of the provisions, they can be violated in ways that wouldn't require the government to prove corruptly, and it might mean that we could charge particular applications of those provisions under them and not under c. 2. The second thing is that some of the provisions sweep more broadly than an official proceeding. They apply in a wider range of circumstances. So that would enable us to charge in those situations where we can't actually prove the official proceeding element. And then third and finally, some of the provisions have a higher penalty specifically because they target more culpable conduct, and that's like 1512 a, the one you referenced about killing a witness. There the government would charge under that provision because it's subject to higher penalties than c. 2. So there's no actual superfluity. Can I ask you, would the government necessarily lose in the sense that they would not be able to bring charges against some of the people that you have described with Justice Kagan if we looked at c. 2 as being more limited, perhaps not all the way to evidence, but related to conduct that prevents or obstructs an official proceeding insofar as it is directed to preventing access to information or documents or records or things that the official proceeding would use? I explored with Mr. Green, and as did Justice Barrett, the idea that to the extent that there were people who knew that the votes were being counted that day, and that's done in a documentary way in our system, their interfering by storming the Capitol might qualify under even an evidence or document interpretation of c. 2. What does the government think about that? Yes, I think that if the court articulated the standard that way, these would likely be viable charges, and as we note in the last minute of our brief, we've preserved an argument that we could satisfy even an evidence-related understanding of c. 2, in part because the very point of the conduct when we have the intent evidence was to prevent Congress from being able to count the votes, from being able to actually certify the results of the election. Now, we'd obviously need to evaluate whether these charges can go forward based on whatever this court says, and I would very much caution the court away from any holding that would require specific evidence by the government of precise electoral certificates or that kind of thing. Here, the point of it would be that those who came to the Capitol and engaged in this criminal conduct to displace Congress violently from where it had to be to count those votes acted with an intent to impair Congress's ability to consider that evidence. General, the district court and the dissent below had a different variation on the statute and how to read it. You were starting to explain that to the chief. Could you do it if we accepted the district court's view? I presume that you could do it if we accepted the dissent below, correct? Yes. But your whole response to Justice Katonji, to Justice Jackson, sorry, to Justice Jackson is that it assumes the dissent's view. I thought that Justice Jackson was potentially proposing even a broader view, including focusing on the availability part and making clear that when the whole point is to prevent the proceeding, including the consideration of evidence in the proceeding from happening, that could qualify. I think it becomes potentially harder on the Judge Katz's view and especially harder on the Judge Nichols' view, and that's precisely because Judge Nichols seemed to think that to prove obstruction, it had to be limited to taking action with respect to the documents themselves, and that would be a difficult standard for us to satisfy. You read our discussion on corruptly yesterday. It's clear. You've endorsed the Robertson view. Could you tell me what you feel about the Walker view, Judge Walker being part of the majority below? I assume you know that. Yes. So Judge Walker articulated an idea that corruptly has to turn exclusively on the government being able to show that the defendant sought to secure an unlawful advantage for himself or someone else. We certainly agree that that's one way for the government to prove corrupt intent. It's a way that has traditionally been deployed in the tax context because the very theory of the case is that the defendant is violating the tax laws or taking efforts to secure an unlawful advantage under the tax laws, but I think that it would be incorrect for the court to suggest that that's the exclusive mechanism for the government to try to prove corruptly. There are various other ways where we might have evidence of, as we think we do here, unlawful means committed with consciousness of wrongdoing, and there's no basis in the common law or in how the term corruptly has long been understood to limit the government's ability to prove it only with that one specific way that Judge Walker pointed to. The drawer in this case appears to be the fear that reading the government's view of either yesterday's case or today on its plain terms would make it so broad that somehow that presents a problem. I think the judges below struggled with that by saying that gets addressed in the word corruptly and in the nexus requirement, which is the point you've made today. But neither of those two issues were resolved below because that wasn't the question below, correct? That's right. The only issue that the D.C. Circuit resolved was the meaning of the actus reus. And the only issue between us is whether we read the words, how we read these words. That's right, but I don't want to lose sight of the fact, as your question touched on, that there are inherent constraints built into the other elements of the statute. The nexus constraint is a really critical one. It is the paradigmatic constraint the court has pointed to to ensure that obstruction statutes don't sweep too broadly and scoop up everyday conduct that might be happening out in the world. It has to have that tight connection, the relationship in time, causation, or logic with the official proceeding. And, of course, corruptly we think sets a very high bar, as evidenced by the fact, as I said to Justice Kagan, it's not like we can even prove it with respect to everyone who was in the riot at the Capitol on January 6th. Thank you. General, are you putting a violence requirement as an overlay on obstruct, influence, impede? And I'm thinking of some of your answers to Justice Alito's hypotheticals. It seemed like you kept emphasizing the aspect of violence that was present on January 6th. So am I understanding you to say there has to be some sort of violence or no? No, we don't think that's a requirement under the statute. I think it will clearly be easier for us to satisfy things like the corruptly mens rea when we can point to action here like assaulting a police officer that is obviously wrongful, unlawful conduct, and everyone knows that that's a crime and you cannot do that. What I was trying to say to Justice Alito is in situations where hypotheticals press on the idea that people are engaging in conduct that maybe they think is constitutionally protected, they might be wrong about that. There might not be a First Amendment right that they think they have, but that can demonstrate that they don't have the requisite consciousness of wrongdoing that would mean we couldn't prove an obstruction charge. Thank you, Counsel. I'm not quite sure I understood the answer you gave earlier about whether or not you've previously used C-2 in this type of case. Have you done that before or not? We have charged C-2 in situations that don't involve evidence impairment and the litigating position of the Department has long been that, as its plain language suggests, it covers myriad ways of obstructing. I'm not aware of any other factual circumstance or event out in the world where we could have proved all of the elements of Section 1512 C-2 beyond the cases where we've brought those prosecutions. Just so I understand, the prosecutions are limited in what way? They're limited to a requirement that the specific people had in mind an official proceeding. So that would take out the category of hypotheticals where maybe you're protesting a branch of government, you're outside this court, but you don't have this specific argument in mind. And then we would also need to show an intent to obstruct the proceeding and the nexus to the proceeding, and that can take care of, you know, situations where maybe someone's pulling a fire alarm in a different building, but it's not even though the proceeding happened. In prior cases, you have applied C-2 in a situation, what, not involving specific documents? Correct. So things like tipping off someone to the existence of a grand jury investigation, or the identity of an undercover officer, or creating a fake court order that has nothing to do with the evidence in the case, but is just prompting the litigant to dismiss a pending mandamus petition. And your friend points to an Office of Legal Counsel opinion from 2019 that, I haven't looked at it yet, but I will. It says it is consistent with Judge Katsas' opinion below. So that advice that was offered to the Attorney General and never adopted as a formal position of the Department of Justice related to distinct issues that arose out of the special counsel investigation and distinct issues that involved the Office of the Presidency, I don't think that it would be right to suggest that the memo took any firm stand, although it did suggest that maybe 1512 C-2 should be understood more narrowly. But it didn't, it certainly didn't represent any formal adoption of that position, and that would have been inconsistent with how the government has always litigated under C-2. What constitutes a formal acceptance of OLC opinions? I should probably know the answer to that one as a matter of DOJ policy. But what I can tell you is the reason I'm saying that wasn't an official position is because it specifically said there's no need to go down the road of even deciding exactly what 1512 C-2 covers, because even assuming that it covers the full range of obstructive conduct, the allegations, according to the memo, didn't satisfy the standards there. So it ultimately just punted on the issue and said it's not necessary to engage with that issue further. Thank you. Justice Thomas? General, you said, as I understand it, that you have applied C-2 in previous cases. That's right. We've applied it in cases that do not fit the evidence impairment model that Petitioner is urging on the Court here. And it's not just C-2, Justice Thomas, but it's the omnibus clauses of 1503, 1505, 1712. These are statutes that use the exact same verb phrase. Those are fine, but C-2. Yes. I'm not clear as to whether or not the specific instances in which you have used C-2, because you seem to think or argue that C-2 is a standalone provision almost. We think that it covers the full range of obstructive conduct that's not covered by C-1, of course limited by the requirement of an official proceeding. So if you have applied C-2, have there been previous, other than the D.C. Circuit, previous courts of appeals that looked at this? Yes. And the uniform consensus among the court of appeals has been that C-2 is not limited by this kind of evidence impairment gloss that Petitioner is asking the court to read into the statute. There has been no court of appeals that's gone the other way. We cite a string cite of them that have recognized, looking at the plain language of this provision, that it sweeps in the myriad forms of obstructive conduct. So much of your argument seems to hinge on this being fairly clear, your interpretation of C-2. Yes. We certainly think we have the best of the plain text. Okay. If we think, if I happen to think it's more ambiguous, what would your argument be? So what I would say is I think that if you look at the terms in the statute themselves, that the plain language of the statute supports our view, but it doesn't end there. And I have mentioned several times the other provisions in 1503, 1505, but we think that's actually really relevant because Congress wasn't writing on a blank slate when it enacted 1512 C-2. It's not like it just thought of for the first time this verb phrase, obstructs, influences, or impedes. That wasn't taken out of the ether. That was a well-established term, verb phrase, and obstruction law drawn from those other statutes. And as this court has said many times, when Congress takes a phrase like that, it brings the old soil with it. And so Congress would have clearly known that the courts, this court and lower courts, had interpreted the omnibus clause in those other statutes to encompass the full range of obstructive conduct. That's also consistent with all precedent, as I mentioned to you earlier. So I think when you put it all together, there's no real ambiguity here. We clearly have the best reading. And the only other thing, the icing on the cake, if I could, is that if actually what Congress wanted to do is write a statute that focused only on evidence impairment, there was a really clear and obvious way to do it. Congress could have just tacked on a residual clause to see one that says or otherwise impairs evidence. It would not have used this oblique reference of otherwise and then used a term that had a well-settled meaning in obstruction law to sweep more broadly to try to convey that type of limited scope. It would just be nonsensical for Congress to draft that way because it would be so readily misunderstood. And, in fact, every lower court has understood Congress to have legislated more broadly here. But that's beginning to sound more like a contextual argument, which you seem to eschew in this case. Well, no, I think actually that the statutory context in history does bear weight here. And we think that the roots of this language and those other obstruction provisions help fortify or reinforce how the court has always understood the law. Justice Alito? You argue that there's an exception for conduct that has only a minimal effect on official proceedings. Where does that come from in the text? That comes from the verb phrase obstruct, influence, or impede, which we think, if you look at dictionary definitions, conveys the type of action that blocks, hinders, makes difficult, persistently interferes with. The verbs themselves, we think, inherently contain this limitation. There can't be a minor impediment? I think as a colloquial matter, yes, maybe. But we think that if you look at what Congress was trying to do as a whole, the lead term here is obstruct. These were various ways of trying to capture the world of obstructive conduct. And I think that that adequately conveys the idea that some kind of very minimal, de minimis interference doesn't qualify. So it didn't stop with obstruct. It added impede. But what is the meaning of, how would you define a minimal interference? I suppose a jury would have to be charged on that. In order to prove that the person violated this provision, you must find that the person committed more than caused or intended to cause more than a minimal interference. How would you define it? So I think, you know, to the extent that this would come up in actual prosecutions, and I'm not aware of any, but if this came up, then I think that it would be the defense theory. It's possible that the court could decide it as a matter of law. If in fact it was so minimal, it doesn't fit within the statutory terms themselves. And I recognize that maybe there could be gray areas about the nature of the obstruction and whether it really satisfies the actus reus. I think that is properly. What about the example I gave you about the five protesters in the courtroom? Is that minimal? I think that sounds minimal to me. I mean, it sounds to me like if it hasn't actually forced any substantial halt to these proceedings, it seems like that wouldn't pick up and track. But, you know, the same issue would arise under 1503, which likewise refers to obstruct, influence, or impede. You haven't said anything about the surplusage arguments. Let me just ask you a question or two about that. Suppose someone commits conduct that falls squarely within 1512D. The person intentionally harasses another person and therefore dissuades that person from attending or testifying in an official proceeding. So you've got a square, you know, a clear violation of 1512D punishable by no more than three years in prison. But when Congress added 1512C2, which seems to cover exactly that conduct, it said, well, the punishment shouldn't be, you can punish that person for up to 20 years. There's a key difference between 1512D and 1512C, in that D doesn't require the intent to obstruct. And so the effect of the defendant's harassment action is to prevent the testimony or the production of the document. But the government has not read that statute to require an actual intent to obstruct, which I think means there are certain factual scenarios where the government might be able to prove a 1512D offense without satisfying C2. But I do want to be responsive to the broader concern that there's something anomalous about the 20-year penalty here. Let me say at the outset that no matter which statute the government charges under, with respect to all of the relevant obstruction statutes here, they would be funneled through the same sentencing guideline. So the charging decision wouldn't make a difference with respect to the sentencing range. And the concern you have with the hypothetical arises equally on petitioner's reading, because so, too, everything that would be covered in 1512D falls within his evidence impairment limitation. So I don't think the existence of a statutory max when there's no mandatory minimum should drive intuitions about how to interpret this provision. Well, I'm not sure that's the correct interpretation of subsection D1. How about 1512B, which also has a 20-year penalty, but it seems to be completely subsumed by C2? I think there is a lot of overlap between B and C. I don't deny that. Again, that would be true on either reading, because B is paradigmatic witness tampering. And so even on petitioner's understanding of the statute, there would be equal duplication there. What I would say is there's no actual superfluity, because there are ways of violating B that wouldn't fall within our understanding of C2, including acting in a misleading manner towards someone, which wouldn't necessarily satisfy a corrupt intent definition. Really? You think you could knowingly threaten or corruptly mislead someone? I don't understand that argument. So my recollection is that there are multiple different means of carrying out that offense. Of course, something like threatening or corruptly persuading, that's the kind of duplication I was referring to earlier. But another way you can violate B is through intentionally misleading someone. That wouldn't necessarily require corrupt intent. Okay. Thank you. Sorry. One more question. I was struck by the contrast between your argument here that the court should read in a minimal exception with the argument that you made earlier this term in Muldrow v. City of St. Louis, where the question was whether an adverse employment action has to be significant or not. And you said, no, it doesn't have to be significant because, quote, the text likewise admits of no distinction between discrimination that results in a significant or insignificant disadvantage. So in Muldrow, you told us, no, don't read in an atextual requirement of significance. But here you seem to be arguing, yes, you've got to read in an atextual requirement of something that's more than minimal. No, that is not our argument here. We are grounding this in the text. So we're not suggesting that there's a basic de minimis principle that applies throughout all the various legal statutes that are out there, not anything like that. Instead, we ground this in a particular understanding of what it means to obstruct and what that word conveys. Thank you. Justice Sotomayor. I know the Risch case because I decided it. However, the tip cases, are they in your briefs? We cite Ehrenfeld. That's the case where a subject of a grand jury investigation was tipped off about the existence of the investigation, but there was no kind of material impact or clear evidence of impairment of the evidence or availability of testimony or physical documents. And there are a number of cases in that line, including, I don't think we specifically cited, but it includes disclosing the identity of an undercover officer. Where do I find those? We would be happy to supply additional citations if you're looking for them. I believe that the DC circuit decision as well cited a range of C2 cases and made clear that they didn't cover evidence impairment. Thank you. Justice Kagan. Mr. Green referred a few times to 1519 and basically said, well, that's supposed to be the catch-all provision, the omnibus provision. You know, why are you asking 1512 to do the same thing that 1519 is supposed to do? So that's one question I have for you. And the other question I have is just, you've referred a number of times to other omnibus provisions, 1503, 1505. What's the tax on 70? 7212. 26 U.S.C. 7212. If we go down Mr. Green's road in terms of importing other limits from other places in the statute, are any of those likely to be challenged in the same kind of way, or are they written sufficiently differently so that we wouldn't have to worry about that? So let me take the questions in order. With respect to petitioners' reliance on 1519 as the catch-all here, I understood the court's decision in Yates to say precisely the opposite. In fact, Yates drew a direct comparison between 1519 on the one hand, which it said was a more narrow obstruction provision based on some of the contextual clues there, and 1512C1 on the other hand, which has the phrase record document or other object, and said, well, that's the broad obstruction provision. That's the one that's intended to be codified in this broader prohibition that's aimed at official proceedings, and that C1 language is actually quite broader and would scoop up the entire world of physical objects in contrast to the narrowing interpretation the court accepted in Yates. So I don't think the idea that 1519 was the broad catch-all can in any way be squared with what that statute says or how this court interpreted it in Yates. And instead, I think that the example to draw from Yates or the lesson to learn from it is that this court recognized that Congress was plugging the specific hole in the law with overlapping provisions, 1512C1 and 1519, but it was 1512 that the court pointed to as the place where you would sensibly locate this broader provision that aims at the full range of obstructive acts to catch the known unknowns. With respect to the question, I'm sorry, now I'm forgetting the second question, oh, about the other statutes and whether they would be endangered. I would be concerned about that. I'm sure defendants would try to make arguments. The language, the verb phrase is exactly the same or in different order sometimes, but it obstructs influences or impedes. And so the relevant verbs in the actus reus would be similar. There are different direct objects there. For example, in 1503, it's the due administration of justice. In 1505, it's the administration of the power of Congress's inquiry and investigation, but it's not clear to me whether the, whether defendants might seek to try to now artificially limit those, those clauses beyond their plain terms, even though these kinds of provisions have been in the obstruction law. I think it traces all the way back to 1830 and they've never been understood to have that kind of narrow limitation to evidence impairment or anything else. Thank you. The key word in that is otherwise, and trying to figure out what that means under our established principles of statutory interpretation, it would seem to trigger a use of generous under the big A precedent. And you've used the phrase a few times, catch all provision as does your brief and Scalia Garner book describes just generous as how you interpret catch all provisions. Some does just some generous apply here or not? No, we don't think it can sensibly apply here. So the court has said many times that otherwise is a natural way for Congress to create a broad catch all category. And I certainly don't dispute that there can be situations where you have a broad catch all category, but that's just not how 1512 C is structured. It has, as I've mentioned, it's own complex internal structure. You know, you've got the mens rea requirement that's unique to C1 and Congress did not transplant that into C2. That triggers the other Canon that when Congress uses disparate language and two adjacent provisions, usually it means something by that. So I think that this just isn't the kind of situation where the court could sensibly apply used and generous. And the other thing I would say is that, you know, if the court goes down the road of trying to glean some kind of requirement from C1, the other reason the Canon is inapplicable here is that it's not evident on its face, what the common attribute would be. And that's related to the natural chastis dispute. As you know, that's true. And almost every used some generous case in the, in the treatise explains that as well, which is it's hard sometimes to figure out what the common link among the words in the, in the phrase is. So that's, I don't think that distinct, that point, I don't think distinguishes this case from other used to generous cases, but you can respond to that. But I do think that a plain speaker of English would recognize that usually the common link or the connective tissue is the language that follows the word. Otherwise that's the congressionally approved similarity. That's what C1 and C2 have in common. They both relate to obstructing an official proceeding. And, you know, I recognize that petitioner has invoked the gay, your question touched on it, but the statute and the gay, which we think is not the model of statutory interpretation to follow here. The statute itself was, was relevantly different. It had a list of nouns. And so it was the kind of statute where potentially a Houston generous could apply. What about the contextual points? A couple of them that I think have come up, but I just want to make sure you have a chance to respond that it would be odd to have such a broad provision tucked in and connected by the word. Otherwise. I don't think that the placement in the statute is odd at all for a couple of different reasons. One is the point I was trying to make to justice Kagan about this court's own recognition that 1512 is one of the big obstruction statutes. This is the statute that is aimed generally at official proceedings. It's not more discreet. And there are other provisions like 1519 and some of the ones that come right before it that are more narrowly confined and are intended to reflect discreet circumstances that doesn't describe 1512 at all. So when Congress was trying to broadly prohibit obstruction of official proceedings, 1512 was exactly the right place to go. Then petitioner says, well, Congress buried it in the middle of the, of the statute. But I think it's actually quite explicable when you look at how the other provisions are structured. 1512 D, which I was discussing with justice Alito has a much more minimal penalty and doesn't require the intent to obstruct. So it made sense to put 1512 C before it, but also after 1512 A, which is the most serious obstruction like killing a witness punishable by 30 years or up to life. Last question. There's six other accounts in the indictment here, which includes civil disorder, physical contact with the victim assault entering and remaining in a restricted building, disorderly and disruptive conduct, disorderly conduct in the Capitol building. And why aren't those six counts good enough? Just from the justice department's perspective, given that they don't have any of the hurdles because those counts don't fully reflect the culpability of petitioners conduct on January six, those counts do not require that petitioner have acted corruptly to obstruct an official proceeding. And obviously petitioner committed other crimes that we've charged and that we're seeking to hold him accountable for. But one of the distinct strands of harm, one of the root problems with petitioners conduct is that he knew about that proceeding. He had said in advance of January six, that he was prepared to storm the Capitol prepared to use violence. He wanted to intimidate Congress. He said they can't vote if they can't breathe. And then he went to the Capitol on January six with that intent in mind and took action, including assaulting a law enforcement officer that did impede the ability of the officers to regain control of the Capitol and let Congress finish its work in that session. And I think it is entirely appropriate for the government to seek to hold petitioner accountable for that conduct with that intent. The sentences, the sentence available is longer for this count than for any of the other counts or all of them together. The statutory maximum is higher, but after a recent decision in the DC circuit, which held that a particular sentencing enhancement doesn't apply, that was the Brock case. I believe the sentencing range, the guidelines range for the assault count would actually be a higher guidelines range. And just to give you a sense for a typical January six defendant, someone who doesn't have a prior criminal history and who committed violent conduct at the Capitol accepting responsibility. I think the average guidelines range or the range that would yield is 10 to 16 months of imprisonment for someone who didn't commit violence. It would be six to 12 months of imprisonment. We've looked at the average sentences here. There are about 50 that have gone to sentence and conviction and sentencing on just a 1512 C2 is the only felony. So I think that's the best way to gauge it. This was when the sentencing enhancement did apply. So the ranges were higher. The average sentence among the approximately 50 people is 26 months of imprisonment and the median has been 24 months. So there's, there's no reasonable argument to be made that the statutory maximum here is driving anything with respect to sentencing. Thank you. General. I want to ask a clarifying question about the distinction and the government's charging decisions between C1 and C2. Actually, let me make that stronger net charging decisions like what you could charge under the statute. So as you pointed out to justice Kavanaugh, just now, you know, C1 has this additional mens rea requirement, but you know, there is overlap. If you read otherwise obstructs influences, et cetera, broadly, it would encompass, you know, frankly, even on the other reading, it would encompass things like alters, destroys, mutilates, et cetera, but you wouldn't have to prove the extra mens rea. I thought I heard you say, and I just want to clarify to justice Jackson earlier in the argument that the government could not charge an alteration mutilation, concealing a document or physical objects under C2. That's correct. We usually charge the specific paragraph. And so if the conduct fits within C1, we would charge it under C1 and that would be the proper place to locate the charge. And is that charging is that prosecutorial discretion or do you think the statute would permit you to charge it under C2? Thereby escaping the specific intent requirement. Well, let me say that there is a specific intent requirement under C2. So there's no distinction, but it's the intent to obstruct the official proceeding. So you're right that we wouldn't have to prove intent to, you know, mutilate a document or something, but we would still have to show the intent to obstruct the proceeding. You know, this is pressing on honestly, what's a difficult question about means versus elements. And I think the best look at the best reading of the statute is that these are different elements because they have these different actus re, they have the different mens rea requirement, the mens rea requirement is specific to C1. They each independently prohibit attempts, but it's a, it's a hard question ultimately. And if we charge under the wrong paragraph accidentally, I think we could usually say that that was harmless error or else recharge under the correct paragraph. Okay. Let me ask you a question that kind of gets at some of the same points that justice Alito's questions we're getting at. So what if on January 6th, the Capitol itself had not been breached. The protest is going on outside the Capitol. Stop the steal, stop the steal. Police are, you know, in megaphones saying disperse, disperse. They're too close to the Capitol. Their goal is to impair, impede, stop the proceeding, stop the counting of votes. Does that violate the statute in your view under this impede language? So I think, I think that one relevant question would be whether we could satisfy the natural and probable effect of that conduct would be to have some effect on what's going on in the Capitol and in the mind. You can. Yes. So if you're assuming that the same thing happened where Congress had to go into recess and couldn't hold the joint session after all, because there was such a security risk, I think that that probably would be chargeable if we had the intent evidence. Now, as I mentioned before, even with respect to the riot that happened, which was a much more serious breach, we don't have that evidence of intent for everyone. But if we had, for example, where it was absolutely clear that they were the ringleaders who had intended to obstruct and undertook the action with that specific intent and did so knowing it was wrongful. And especially if they went, you know, I'm assuming you're saying they're in the unauthorized area right outside the Capitol. That is unlawful conduct committed with consciousness of wrongdoing. If we have the proof of it. Let's say that I am having a hard time seeing, like accepting your limiting construction of the verbs, obstruct influence or impedes to have this extra element. Tell me why I shouldn't be concerned about the breadth of the government's reading, just relying on corruptly and the nexus requirement. Should I be concerned or could you just embrace it and say, yeah, there might be some ads applied first amendment challenges or that sort of thing. I mean, can I, can I be comfortable with the breadth if that's what I think? Yes, you can be. You certainly don't have to agree with us that a de minimis hindrance wouldn't qualify. If you thought that this was unqualified and swept broadly to any kind of hindrance whatsoever, there would still be really important limits in the statute. Obviously you'd have to have the official proceeding. I think the nexus requirement could be somewhat harder to establish in a circumstance where you might not think that the natural improbable effect of the conduct is going to be to obstruct the proceeding. You'd have to show that the defendant knew that the natural improbable effect would do that. You'd still have to show the corruptly mens rea. And as you mentioned, even if you could show all of that, if it were a circumstance that really did infringe on first amendment, there would always be the backstop of an as applied constitutional challenge. Do you think it's plausible that Congress would have written the statute that broadly? I mean, let's say that I think that justice Alito's example of the protesters in the courtroom, you know, it's, it's, let's say it's corrupt. It and it impedes the proceeding because we have to go off the bench and things are stopped. Let's say, I think that that's covered by the word impedes and let's there's the nexus that it's correctly. Is it plausible to think Congress wrote a statute that would sweep that in? Yes. I think that there are a lot of legitimate ways to, to try to voice your dissent. If you disagree with what the court is doing, but one of the ways you cannot do it is come into this courtroom, halt the proceedings, force the justices to leave the bench and do it with the intent and the corrupt mens rea. I think that Congress could think that is a severe intrusion on the functioning of our government and want to protect against that. And again, the 20 year statutory max of course is just a max. There's no mandatory minimum. So Congress would have recognized that sentencing courts would use their discretion to tailor the actual sentence to the facts of that specific offense. Thank you. Justice Jackson. So you've emphasized several times that Congress wasn't writing on a blank slate in 1512C. But do you dispute that it was writing against the backdrop of a real world context? It was in the wake of Enron. There was document destruction. And, you know, there was nothing as far as I can tell in the enactment history as it was recorded that suggests that Congress was thinking about obstruction more generally. They had this particular problem and it was destruction of information that would have could have otherwise been used in an official proceeding. So can you just give us a little bit more as to why we shouldn't think of this as being a narrower set of circumstances to which this text relates? Sure. And, you know, I'd start by saying that we of course acknowledge that the immediate impetus for adding 1512 to the statute was to close the Enron loophole. It was a glaring loophole in the coverage of the obstruction laws that it wasn't a crime for you personally to destroy the document and the government had to charge people for instead persuading other people to destroy documents. So that was front of mind for Congress and Congress wanted to address it. It did address it with C-1 and with 1519 separately. But I think the best way to look at what Congress was doing in light of that context is to consider the fact that Congress went further and enacted C-2. The broader lesson Congress took away from Enron is that when you set out in advance to try to enumerate all the various ways that official proceedings can be obstructed, things will slip through the cracks. You can't only force it. Let me just ask you this. Was C-2 enacted at the same time as C-1? Yes, it was. So why couldn't the broadening relate to other ways in which one might prevent a proceeding from accessing information? So one is documents, records, and other objects. But the known unknown, we don't know, you know, could it be intangible, for example, that C-2 is sort of getting at when one gets at physical objects? I guess I'm struggling with leaping from what's happening in one in the context in which it was actually enacted to all of obstruction in any form. So I think the reason why we wouldn't suggest that the context could bear that narrower reading is because of the actual language that Congress used. If it was really just worried about other kinds of record-based, proceeding-based, evidence-based ways of obstructing, then there were easy templates to add that in as a residual clause to C-1. There was no need to have this entirely separately numbered prohibition. And especially, there was no need to use the well-recognized verb phrase obstructs, influences, or impedes, which was clearly drawn from these other omnibus clauses that sweep more broadly. So I think, you know, we think that it's perfectly consistent with the statutory history here to recognize that after Enron, what Congress thought is we don't want novel ways that we aren't thinking about of obstructing a proceeding to not be a crime. We do want to cover the waterfront of obstructive conduct with the backstop of And that's exactly what the words of the statute say. Thank you. Thank you, Counsel. Rebuttal, Mr. Green? Justice Sotomayor, a defendant who tips off a grand jury witness or tips off the targets of a search warrant is someone who is certainly attempting to impair the integrity or the availability of evidence and would be covered by C-2, just as somebody who creates a document and then that document is shown to counsel and counsel withdraws a mandamus petition has in fact created something that has caused an interference with an official proceeding. I heard my friend say twice in response to your questions, Justice Gorsuch and Justice Barrett, that C-2 would cover peaceful protests. As long as she could demonstrate or the government could demonstrate that there was the adequate mens rea and a nexus. As the nexus, let's look at what 1512F says. For the purposes of this section, an official proceeding need not be pending or about to be instituted at the time of the offense. There is no nexus. Congress has written it out of the statute right there. If the J-6 defendants came on January 5th and did all the kinds of things that they did, maybe one would hope, but if it had happened that way, it would still be a C-2 violation. With respect to the corrupting mens rea, Justice Kavanaugh, you asked a question yesterday about the fact that mens rea as a break only works at trial because the government's allegations are taken as true at the motion to dismiss stage. And I think that's exactly right. And that's why it's not a break at all, or if it's any kind of break, it's a break on a go-kart. It's a wooden stick. What it means is that people like Mr. Fisher have to sit and go to trial and seek to win on a Rule 29 motion because the government hasn't proved their mens rea. The same is true of First Amendment defenses. Peaceful protesters are charged with C-2. My friend referred to 1503 and 1505, other statutes within, and a number of the justices have pointed out that there are much lower penalties for significant crimes. I would point the court to 1752, which is civil disobedience in a restricted space, which is what Mr. Fisher is charged with. That's a misdemeanor. If you cause substantial bodily injury, that is a 10-year maximum penalty. The government wants to unleash the 20-year maximum penalty on potential peaceful protests. That in and of itself is a bad idea because it's going to chill protected activities. People are going to worry about the kinds of protests they engage in, even if they're peaceful, because the government has this weapon. Finally, I think we haven't touched very much on the breadth of influence because that's one of the words that's used in C-1-2. Not only would it be peaceful protests, it could be advocacy, it could be all kinds of lobbying. Those things would be covered as well, we've pointed out in our briefs. Finally, I would say to the court, let's not forget that civil proceedings are covered here. We would submit civil evidentiary proceedings, but civil proceedings. The government is suggesting that the court should unleash a 20-year maximum obstruction statute on civil litigation in federal courts. I submit that that is, and we would submit that that is a very serious tool to put in the hands of prosecutors. We urge that the court reverse the D.C. Circuit. Thank you, Counsel. The case is submitted.